## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AARON THOMAS OUTLAW #353-453
     Plaintiff                    :

                v.            :    CIVIL ACTION NO. DKC-13-1918

DR. WACCA MERID, M.D.[1]       :
DAMON FAYALL
MS. PATIENCE            :
     Defendants

## MEMORANDUM OPINION

On June 27, 2013, Aaron Outlaw ("Outlaw"), a Maryland Division of Correction ("DOC") prisoner then incarcerated at Patuxent Institution ("Patuxent"),[2] filed a civil rights action seeking money damages and alleging that three employees of Patuxent's contractual medical provider failed to provide adequate treatment for his many health problems, including hematuria,[3] and either failed to provide medication to relieve his severe and chronic pain or administered the medication improperly.  Outlaw further contends that Defendants failed to refer him to a pain management specialist.  ECF No. 1.  Now pending is a Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment filed on behalf of Defendants Merid and Fayall (ECF No. 6),[4] which shall be construed as a motion for summary

---

[1] The Clerk shall amend the caption to reflect the full and proper spelling of Defendants Merid and Fayall's names.

[2] Outlaw currently is housed at Jessup Correctional Institution ("JCI").  It appears he was transferred to Patuxent from Eastern Correctional Institution ("ECI") on April 23, 2013, where he remained prior to transfer to JCI on or about October 26, 2013.  *See* ECF No. 1, p. 3; ECF No. 8, p. 2.

[3] Blood in the urine.  For the most part, the medical terminology and definitions are provided by Defendants in their memorandum, by reference either to declarations or to sources whose accuracy can be assumed.

[4] Defendant Merid was one of several health care providers who treated Outlaw during the six months of his confinement at Patuxent.  Defendant Fayall serves as Wexford Health Sources, Inc.'s Health Services Administrator at Patuxent Institution and performs administrative, not medical, duties.  ECF No. 6-5, Affidavit, ¶ 5.  Counsel for Wexford did not accept service on "Nurse Patience" who is alleged to have called Outlaw names and crushed his

judgment filed pursuant to Fed. R. Civ. P. 56.[5]  Outlaw filed an Opposition (ECF No. 10); and

Defendants filed a Reply thereto.  (ECF No. 11).  A hearing is not needed to resolve the pending

motion.  *See* Local Rule 105.6 (D. Md. 2014).

## Background

Outlaw suffers from several serious medical conditions, including a genetic disorder of

the bone marrow known as familial polycythemia[6] and chronic pain caused by an old gunshot

wound to the lower back and traumatic injury to the right hip and leg, for which treatment

included surgical repair and internal hardware placement.  Outlaw also suffers from asthma,

arthritis, a kidney stone, lumbar root injury, drug abuse and opioid dependence,[7] and psychiatric

disorders.  ECF No. 6-4 (Medical Record); ECF No. 6-5, Affidavit of Dr. Wacca Merid, M.D.

(herein "Affidavit").

An understanding of Outlaw's health status prior to transfer is significant.  On April 9,

2013, two weeks prior to his reassignment to Patuxent, Outlaw was seen by Dr. Ashraf in the

Chronic Care Clinic at ECI regarding his polycythemia, asthma, and arthritis.  ECF No. 6-4, pp.2-

---

pain medication before administering the medication to him.  ECF No. 1, p. 3; ECF No. 5.  For reasons apparent herein, Outlaw's allegations against Nurse Patience are insufficient to support his claim of damages.

[5]  The dispositive submission will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure because materials outside the four corners of the complaint have been considered. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

[6]  Polycythemiavera, also called polycythemia, is a blood disorder in which the bone marrow makes too many red blood cells.  It is often asymptomatic.  Patients are often initially evaluated by Hematology/ Oncology to rule out blood cancers.   There are very few problems associated with the disease with proper monitoring and treatment.  *See*  http://www.mayoclinic.com/health/polycythemia-vera/DS00919.   The disorder may also cause thickening of the blood.  Treatment includes bloodletting (phlebotomy) to keep the red blood cell count below certain levels.  The frequency of phlebotomies depends upon the severity of the disease.  Many patients with this condition are simply advised to donate blood on a regular basis as the sole treatment.  *Id.; see also Outlaw v. Druckman, et al.,* Civil Action No. DKC-11-1961 (D. Md.), ECF No. 12, Affidavit of Dolph A. Druckman, MD, ¶ 2.  Ann Zimrin, MD of the University of Maryland Medical Center (UMMC) had previously determined that phlebotomy was the best course of treatment for Outlaw.  *Id*., Exhibit 1, ¶ 3; Exhibit 3 at 1109-1111.

[7]  Outlaw's drug dependence and drug-seeking behavior, as well as a finding made by an independent pain management specialist, were documented in *Outlaw v. Druckman, et al.,* Civil Action No. DKC-11-1961 (D. Md.), ECF No. 12, Affidavit, ¶ 3; Exhibit 3 at 944-946; Affidavit, ¶ 4 and Exhibit 3 at 84-84.

4.      Outlaw stated that during his last visit to the Hematology/ Oncology group at Peninsula Regional Hospital on February 11, 2013, no treatment was indicated because his red blood cell levels were not too high.   *ld*.   He also reported he previously had a phlebotomy and his condition improved.    Outlaw requested a consult for a phlebotomy because of headache and puffiness of his face.   Dr. Ashraf emailed the outside scheduler to obtain recommendations from that appointment.   Outlaw also complained of swelling in both hands and fingers and morning stiffness with arthritic pain.   Plaintiff admitted the current medications helped his pain which he stated was "...down to a 7 right now."    Dr. Ashraf ordered lab work for evaluation of all complaints and requested a consult with Oncology.   Outlaw was prescribed Indomethacin[8] 25mg twice daily as an adjunct to his existing pain management regimen of Ultram[9] 150mg twice daily and Flexeril[10] 5mg twice daily.    Outlaw was further advised to increase his fluid intake, follow an exercise program, and increase his activity level.  *Id*.

Lab results reported on April 12 and May 13, 2013, showed an elevated hematocrit of 63% and elevated hemoglobin A1Cof 11.5[11] consistent with possible diabetes.[12]     *Id* at 7-9.   ANA testing[13] could not be done because the sample was insufficient.

---

[8] Indomethacin is in a group of drugs called non-steroidal anti-inflammatory drugs (NSAIDs) which work by reducing hormones that cause inflammation and pain in the body.   It is used in the symptomatic treatment of acute and chronic arthritis and other skeletal conditions. *See* http:/lwww.drugs.com/search.php?searchterm-indomethacin.

[9] Ultram (tramadol) is a narcotic-like pain reliever used to treat moderate to severe pain. *See* http://www/drugs.com/ultram.html.

[10] Flexeril (cyclobenzaprine) is a muscle relaxant used to treat muscle spasms and other skeletal muscle conditions.    It works by blocking nerve impulses (or pain sensations) that are sent to your brain. *See* http://www.druqs.com/flexeril.htm.

[11] Hemoglobin A1C tests for the amount of sugar sticking to red blood cells.  Red blood cells that circulate in the body live for about three months before they die.  When sugar sticks to these cells, it gives us an idea of how much sugar has been around for the preceding three months.    In most labs, the normal range is 4-5.9 %.  In poorly controlled diabetes, its 8.0% or above, and in well controlled patients it's less than 7.0%.    See www. medicinenet.com.

On April 15, 2013, Dr. Clem noted that Plaintiff's Ultram had not yet arrived so he substituted Toradol[14] 30mg intramuscularly twice daily for pain management. *Id.,* p. 10. The following day, Apri116, 2013, Dr. Clem noted that a therapeutic phlebotomy was approved. *Id.,* p. 11.

Upon transfer to Patuxent on April 23, 2013, Plaintiff submitted a sick call request to see a pain specialist because the medication "does nothing" to relieve his body, hip, and side pain. *ld*., p. 13. Plaintiff completed another sick call request on April 24, 2013, requesting to see a doctor for his pain. *Id.,* p. 14. On April 25, 2013, Plaintiff did not appear at the infirmary to obtain his morning Ultram and Flexeril pain medications. *Id.*, p. 15.

On April 26, 2013, Plaintiff was seen by Physicians' Assistant ("PA") Frew for multiple complaints of pain including severe pain in left hip, lower back, and right shoulder. *Id*., pp. 16-17. Plaintiff requested referral to a pain management specialist, claimed previous prescribed medications afforded him no relief, and specifically requested MS Contin[15] and Tylenol #3[16] for

---

[12] Diabetes can damage nerves in the body due to high blood sugar levels causing chronic pain. *See* http://www.nlm.nih.gov/medlineplus/ency/article/000693.htm.

[13]The antinuclear antibody (ANA) panel is a blood test that looks at antinuclear antibodies which are substances produced by the immune system that attack the body's own tissues. Testing is indicated if signs of an autoimmune disorder, such as systemic lupus erythematosus or unexplained symptoms such as arthritis, rashes or chest pain are present. ANA may be present in multiple conditions including chronic liver disease, inflammatory muscle disease, rheumatoid arthritis, or thyroid disease. *See* http://www.nim.nih.gov/medlineplus/ency/article/003434.html.

[14] Toradol (Ketorolac) is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs) which work by reducing hormones that cause inflammation and pain in the body. It is used short-term (5 days or less) to treat moderate to severe pain, usually after surgery. It is used alone or in combination with other medicines. *See* http://www.druqs.com/toradol.html.

[15] MS Contin (morphine sulfate) is a long acting narcotic indicated for the management of moderate to severe pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time. *See* http://www.drugs.com/pro/ms-contin.html.

[16] Tylenol with codeine is a combination of acetaminophen and codeine. Acetaminophen is a pain reliever and a fever reducer used to treat many conditions including headache, muscle aches, and arthritis. *See* http://www.drugs.com/acetaminophen.html. Codeine is an opioid or narcotic pain medication used to treat mild to moderately severe pain. *See* http://www.druqs.com/codeine.html

breakthrough pain during the day.    A hip x-ray was ordered and Plaintiff's Indomethacin was switched to Motrin, but otherwise the pain management plan remained unchanged.    It was noted that Plaintiff had been approved for phlebotomy for elevated hemoglobin/hematocrit prior to transfer to Patuxent and that the consult would be forwarded for scheduling.  *ld*.

On May 1, 2013, Plaintiff did not show up to receive his morning Ultram and Flexeril pain medications.  *Id.,* p. 18.   On May 2, 3013, Plaintiff submitted another sick call request, again requesting to see a pain specialist for his extreme pain.  *Id.,* p. 19.    On May 5, 2013, Plaintiff submitted a sick call request for "pissing blood", a blister on the bottom of his right foot and right side body/hip/low back pain.  *Id.,* p. 20.

On May 7, 2013, Plaintiff was seen by Frew at sick call and complained he was not receiving his morning Ultram.  *ld*., pp. 21-22.    Defendants admit it had been sent to another facility.  An early refill was entered.  Plaintiff also reported a one day history of "pissing blood" and indicated he had suffered kidney stones in the past.  Urine and blood count testing was ordered.  *Id.*   Later that evening, Plaintiff received a single injection of Nalbuphine[17] 1 0 mg intramuscularly on the order of the on-call physician assistant in lieu of oral Ultram.  *Id.,* p. 23.  A Release of Responsibility form was completed after Plaintiff refused Tramadol and Flexeril.  *Id.,* p. 24.

On May 13, 2013, Plaintiff was evaluated by Dr. Merid in the Chronic Care Clinic for erythrocytosis[18] secondary to familial high affinity hemoglobinopathy,  chronic pain, and

---

[17] Nalbuphine (Nubain) is an analgesic used to treat and prevent moderate to severe pain.  It works by blocking certain receptor sites in the central nervous system, which helps to decrease pain.  It can also be used for pain relief before and after surgery and during childbirth.  *See* http://www.drugs.com/cdi/nalbuphine.html.

[18] Erythrocytosis secondary to familial high affinity hemoglobinopathy is a less common cause of polycythemia in which here is a problem unloading oxygen at the tissue level causing the body to compensate by increasing red cell mass.  The most common symptoms are headache, dizziness, tinnitus, and memory loss.  *See* http://www.mayomedicallaboratories.com/test-atalog/Clinical+and+lnterpretive/84160

recurrent hematuria.  *Id.*, pp. 25-28.    Plaintiff stated he had a history of cancer, but was informed otherwise by Dr. Merid, based on the 2010 UMMS hematology notes by Dr. Ann Zimrin, which indicated Plaintiff has secondary erythrocytosis due to abnormal hemoglobin, not the polycythemia vera which can sometimes lead to cancer.    Plaintiff indicated his understanding at that time.    Dr. Merid further noted that Plaintiff had a follow-up evaluation with Hematology/Oncology that same week.    Plaintiff reported worsening pain, especially in the lower back and right hip, that was further exacerbated by movement.    He indicated that pain was better controlled while on MS Contin, but Plaintiff was weaned off the medication while at ECI.    A musculoskeletal examination, including range of motion, was normal except for posterior tenderness of the spine, paravertebral muscle spasm, and right lumbosacral and sacroiliac tenderness for which Plaintiff was already receiving treatment with Ultram and Flexeril.    Dr. Merid noted that Plaintiff had an unremarkable CT of the abdomen pelvis in February of 2011 and of the thoracic and lumbar spine in July of 2011.    Recent x-rays were noted to be still pending.  *ld.*

Dr. Merid reviewed nephrology notes from July of 2009 and noted recent normal cystoscope and retrograde pyelogram[19] for recurrent hematuria, prescribed Tylenol #3 through May 29, 2103, for pain management and Bactrim through May 20, 2013, for a possible urinary tract infection ("UTI") pending the outcome of additional testing, and discontinued Motrin because of possible contraindication with hematuria.    *ld.*

---

[19] A retrograde pyelogram is a type of X-ray that allows visualization of the bladder, ureters, and renal pelvis.  The test usually is performed during a procedure called cystoscopy-evaluation of the bladder with an endoscope (a long, flexible lighted tube).  During a cystoscopy, contrast dye, which helps enhance the X-ray images, can be introduced into the ureters via a catheter.  *See* http://www.hopkinsmedicine.orq/healthlibrary/test procedures/urology/retrograde.

A urine culture reported on May 11, 2013 showed polymicrobial[20] results not requiring further testing.  *Id.*, pp. 29-30.   The follow up urine culture reported on May 20, 2013, again showed polymicrobial results not requiring further treatment.  *Id.*, pp. 31-33.

Radiology report of right hip x-rays read on May 13, 2013, demonstrated no evidence of acute fracture, dislocation, or subluxation.   *Id.*, p. 34.  It was noted that Plaintiff had evidence of an old fracture with multiple metallic foreign body pieces present along the distal shaft of the femur and a metallic rod that appeared stable inside the femur.   *ld.* Medical assignment paperwork was completed May 15, 2013, approving Plaintiff's use of a cane from April 9, 2013, for one year.   *Id.*, p. 35.

On May 15, 2013, Plaintiff was a no show for all morning medications.  *Id.*, p. 36.  That day, a hematology consult was completed at Bon Secours hospital by Dr. Krishnan.  *Id.*, pp. 37-41.   His recommendation was to monitor blood counts and perform therapeutic phlebotomies intermittently to keep hematocrit levels below 60.   Plaintiff's last hematocrit was 63 on April 10, 2013.  No hematuria was noted at the time of this visit.  *Id.*

Plaintiff submitted sick call requests on May 17, 19, 24, and 25, 2013, for complaints of pain, hematuria, and the need for pain management referral.   *Id.*, pp. 42-45.  On May 19, 2013, he was seen by RN Ngochukwu for his dose of Tylenol #3.  *Id,* p. 46.  None was available in supply but a nurse practitioner was called to provide a substitution.  When informed that the NP on call would be contacted for orders, Plaintiff claimed, "You're denying me my medicine, and I'm going to report you all." *ld.*  Plaintiff left after one minute, becoming angrier when asked to sign a release and refusing to do so.  He refused regular Tylenol.  *Id.*

---

[20] Polymicrobial results indicate the presence of several species of microorganisms.  *See* http://medical-dictionary.thefreedictionary.com/hematocrit.

On May 20, 2013, Plaintiff again was seen for a nurse visit for severe "10/10" pain. *Id.,* p. 47. The nurse noted that Plaintiff was now out of his Tylenol #3. In response, Dr. Singh ordered a single dose of Nubain 10 mg. intramuscularly. *Id.*

On May 21, 2013, Plaintiff was again seen by Frew at a provider sick call visit complaining of ongoing pain and requesting that his pain medication not be "crush and float" as required by policy to assure compliance. *Id.,* pp. 48-49. When informed that all chronic care medications were active, blood work and follow up appointments were pending, and that the current treatment plan would be continued, Plaintiff became agitated and threatened litigation if he did not receive his pain medications. No skeletal tenderness was noted on physical exam during this visit. *Id.*

A consult request submitted by Dr. Merid on May 22, 2013, for therapeutic phlebotomy at the Bon Secours Hospital Infusion Center in order to keep hematocrit below 60 was approved on May 23, 2013. *Id.,* pp. 50-52. On May 29, 2013, Frew noted Plaintiff's Tylenol #3 was to expire that day and issued a refill until his next chronic care clinic visit. *Id.,* p. 53.

At Plaintiff's June 3, 2013, Chronic Care Clinic visit with Dr. Merid, Plaintiff's May 13, 2013, psychiatry evaluation of depression with delusional and paranoid disorders was noted. *Id.,* pp. 54-56. When told that psychiatric management would help better manage his pain, Plaintiff stated "They will only give me the same medication and I do not want that." Plaintiff complained that he had not been receiving the Tylenol #3 for breakthrough pain as ordered. Dr. Merid ordered a change in administration time from twice daily to 2 p.m. and 10 p.m. to better accommodate institutional movement, and renewed the prescription for Tylenol #3 through July 3, 2013. Physical exam at that time demonstrated no skeletal tenderness or joint deformity and a normal gait. Merid ordered a repeat urinalysis and urine culture. At that time, Plaintiff

was reporting only intermittent hematuria and no painful urination.  *Id.*  Lab reports from a June 18, 2013 collection indicate that a urine culture could not be performed because the specimen was incorrectly submitted.  *Id*., pp. 57-63.

On June 6, 2013, Plaintiff submitted a sick call request for an Ultram refill.  *Id.,* p. 64. The following day he was seen at sick call by Frew for an Ultram refill, and again requested that he did not want his meds to be crushed and floated.  *Id.,* pp. 65-66.  Plaintiff was told to report for his 10 p.m. Tylenol #3 at 9 p.m. due to custody policy prohibiting movement after 10 p.m. A note indicates Plaintiff was observed running down the stairs without limping or apparent discomfort.  *ld.*

A Release of Responsibility was completed June 13, 2013, after Plaintiff refused medications.   An unscheduled nurse visit with LPN Baptiste that same day notes that a verbal order was received by a physician for Tylenol #3 until Ultram medication arrived later that evening.  *Id.,* pp. 67-68.  Plaintiff submitted a sick call request on June 20, 2013, noting he had not seen a pain management specialist nor received a phlebotomy or treatment for his blood cancer.  *Id.,* p. 69.

On June 21, 2013, Plaintiff was seen by Frew for recurrent hematuria.  Plaintiff denied any other UTI symptoms and reported compliance with previous antibiotic orders.   A urine specimen revealed markers for possible UTI and Bactrim was prescribed.  It was again noted that the phlebotomy consult was approved and Plaintiff's non-compliance with his medications was discussed.  *Id.,* pp. 7-71.

On July 10, 2013, Plaintiff was seen at sick call for cold symptoms and blood treatment. Plaintiff did not complain of pain or hematuria and his physical exam was negative for skeletal tenderness or joint deformity.  Notes from this visit indicate active prescriptions for Tylenol #3

through August 3, 2013; Ultram through August 7, 2013; and Flexeril through September 13, 2013.  Plaintiff was informed his phlebotomy was approved and he was awaiting transfer.  *Id.,* pp. 72-73.

On July 23, 2013, Plaintiff was sent to Bon Secour Hospital where the scheduled therapeutic phlebotomy was canceled due to a low hemoglobin of 17.7 and hematocrit of 54.1. Dr. Krishnan ordered monthly blood counts and notification whenever Plaintiff's hematocrit was above 60.  *Id.,* pp. 74-75.  Upon his return to Patuxent that day, Plaintiff reported that only blood work had been conducted at the Hospital. He denied any discomfort or pain.  *Id.,* p. 76.

On August 7, 2013, Plaintiff was scheduled for a Provider Chronic Care  visit with Dr. Merid but he was angry, threatening, unresponsive to questions, and refused to cooperate unless the nurse left the room.  He was also angry that custody would not allow him to retain possession of his cane while in the exam room.  Defendant Damon Fayall, and the chief of security were called to assist.  Merid requested to have the visit rescheduled and discussed arranging a multi-disciplinary case conference for future patient management.  *Id.,* pp. 77-79.

Plaintiff continued to receive medical care following his transfer from Patuxent to JCI. He submitted a sick call request on August 9, 2013, requesting either a bottom bunk and/or a cell on the handicapped tier.   *ld.*, p. 80.  In addition, Plaintiff wanted to see Dr. Moultrie about his injuries and pain medication.  On August 12, 2013, Plaintiff was offered but refused Tylenol with codeine. *Id.,* p. 81.

On August 13, 2013, Plaintiff was seen in the Chronic Care Clinic by Dr. Moultrie and reported that his current medications took the edge off his pain, but that he did better while on Neurontin.   Plaintiff also reported that he had the type of pain he normally got when his hemoglobin is too high, and complained of right flank pain.   His physical exam was normal

with the exception of right lower quadrant abdominal tenderness.  An ultrasound of the bilateral kidneys was requested and urinalysis, CBC, HgbA1C were ordered along with ongoing blood glucose monitoring.  Neurontin 300 mg. twice a day was ordered through November 13, 2013. *Id.*, pp. 82-85.  The consult request for the ultrasound was submitted the same day. *Id.,* pp. 86-87.

On August 16, 2013, Plaintiff refused to attend PA sick call, and a Release of Responsibility form was completed.  *Id.*, p. 88.  On August 19, 2013, Plaintiff was issued a medical assignment for feed-in status for 2 months due to medical reasons.  *Id.*, p. 89.

On August 22, 2013, Plaintiff was seen by Dr. Moultrie after he reported a slip and fall on a wet floor.  Plaintiff further reported he felt something pop in his back, felt as if his knee was going to come out of place, and felt right lateral hip pain since the fall.  In addition, Plaintiff reported constipation.  Radiology tests were ordered and Plaintiff was advised to follow up in 14 days if his condition did not improve or worsened.  *Id.*, pp. 90-91.  Right knee and femur x-rays read on August 27, 2013, showed no acute disease and no evidence of acute fracture, dislocation or subluxation.  The right femur also showed an old healed fracture with post metallic hardware in place with a stable appearance.  *Id.*, p. 92.

On August 28, 2013, Plaintiff was seen by Dr. Ayalew after return from a therapeutic phlebotomy at Bon Secours Hospital.  Plaintiff denied any concerns and was discharged back to his housing unit to be seen in the morning by his provider. *Id.*, p. 93.

On September 2, 2013, Plaintiff submitted a sick call request to see Dr. Moultrie about pain issues.  *Id.*, p. 94.  On September 9, 2013, Plaintiff complained of blood in his urine and requested to see a pain specialist because his current medications were not working.  A urine dipstick, urinalysis and culture were ordered and Plaintiff was advised to avoid heavy lifting

and continue all medication.   Treatment was deferred pending urine culture results and a referral to the physician was ordered.  *Id.,* pp. 95-96.

On September 10, 2013, Plaintiff was seen by Dr. Moultrie for chronic pain and allergies.  He stated his pain in the left hip at times radiated up the spine, giving him headaches, and that his pain medication does not help.  Plaintiff also complained of facial pain, nasal congestion, and a runny nose.  On exam, it was noted that Plaintiff had right maxillary sinus tenderness, post nasal drip, and tenderness in the right hip.  Plaintiff was advised to continue current medications, take prescription nasal saline spray and Daypro,[21] and follow an exercise program.  Bloodwork was ordered and a consult generated for an abdominal CT to evaluate for nephrolithiasis.[22]  *ld*., pp. 97-98.

### Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

---

[21] Daypro (Oxaprozin) is a nonsteroidal anti-inflammatory drug ("NSAID") which works by reducing hormones that cause inflammation and pain in the body and is used primarily to treat arthritis. *See* http://www.drugs.com/mtm/daypro.html.

[22] Kidney stones.

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court′s consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). In any event, in accordance with *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), Outlaw was informed of his right to file a response to the Motion, and the opportunity to submit affidavits, declarations, and other documentary evidence. *See* ECF No. 7. As noted, he filed an opposition in response.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: by its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The Fourth Circuit has explained:  the party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must" set forth specific facts showing that there is a genuine issue for trial.  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)).  However, the court must "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witness' credibility.  *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002).  Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The court must, however, also abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp.,* 477 U.S. at 323-24).

## Analysis

The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  When contractual prison health care providers show "deliberate indifference" to a prisoner's "serious medical needs," their actions or omissions give rise to an Eighth Amendment violation. *Id*. at 104.  The named individual "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The medical treatment provided must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn,* 896 F.2d 848, 851 (4th Cir. 1990).  A defendant must know of and disregard an excessive

risk to inmate health or safety.  "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  *Farmer*, 511 U. S. at 837 (1994).  Thus, a health care provider must have actual knowledge of a serious condition, not just knowledge of the symptoms.  *See Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).  Mere negligence or malpractice does not rise to a constitutional level.  *See Miltier,* 896 F.2d at 848; *see also Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (quoting *Farmer*, 511 U.S. at 835).  An inmate's disagreement with medical providers about the proper course of treatment does not support an Eighth Amendment cause of action.  *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

Here, medical personnel continued to provide potent pain medications to Outlaw, a former heroin user, after his transfer to Patuxent and later transfer to JCI.[23]  Consultations and testing were provided for other medical problems, including his blood disorder and urinary problems.  In short, Outlaw received adequate medical care for all of his health needs, including pain management.  Nothing more is constitutionally required, and Defendants are entitled to summary judgment.  A separate Order shall be entered in accordance with this Memorandum Opinion.

Date:   August 29, 2014                                    /s/
                                                    DEBORAH K. CHASANOW
                                                    United States District Judge

---

[23] Contrary to Plaintiff's allegation (ECF No. 10, p. 3), Defendants, who are medical providers, played no role in these transfers.  ECF No. 11-1.